STEPHEN A. WRIGHT, EXECUTOR OF THE LAST WILL OF ATTMORE R. WRIGHT, DECEASED v. ANN ROSS, EXECUTRIX OF THE LAST WILL OF JAMES ROSS, DECEASED, GEO. A. WORN, THE SAVINGS AND LOAN SOCIETY, EPHRAIM W. BURR, JOHN ARCHIBALD, AND BENJAMIN D. DEAN.

PLEDGE AND CHATTEL MORTGAGE.—The distinction between a pledge and chattel mortgage, whilst well defined in theory, is sometimes difficult of application to the facts of the transaction.

A PLEDGE.—In a pledge, the title, after condition broken, does not pass to the pledgee, who has only a lien on the property; and in all cases the possession must accompany the pledge.

RIGHTS OF PLEDGOR IN CASE OF PLEDGE.—In case of a pledge, the title remains in the pledgor after condition broken, with right to redeem at any time before a sale of the property; and if the property is sold by the pledgee in satisfaction of his demand, he cannot become the purchaser at his own sale.

CHATTEL MORTGAGE.—In case of a chattel mortgage, the title of the mortgagee becomes absolute at law on the default of the mortgagor, and on the foreclosure of the mortgage the mortgagee is at liberty to become the purchaser.

NOTE MAY BE PLEDGED.—A note secured by mortgage may become the subject of either a pledge or mortgage, but to make such pledge available to the pledgee, there must accompany the pledge a power to assign the note and mortgage in case of a sale of it, and to release the mortgage in case of a satisfaction of it.

INSTRUMENT CONSTRUED TO BE CHATTEL MORTGAGE.—If a note and mortgage are sold and delivered by the owner, by an instrument in writing which conveys the legal title, and contains a defeasance in the usual form of a chattel mortgage,

and a further provision that the instrument is made for the purpose of securing a sum of money, and for no other purpose, and that if the assignee collects the money he is to account to the assignor for the excess, and a still further provision that the assignee may insure the buildings on the premises covered by the mortgage assigned, and that the premium shall be a lien on the note mortgaged—the instrument will be treated as a chattel mortgage, and not as a pledge, and upon default of the mortgagor the title at law will vest in the assignee.

RIGHT OF PLEDGEE TO BUY AT JUDICIAL SALE.—If a note and mortgage are pledged by the owner, by delivery and an instrument in writing conveying the legal title to the pledgee, and authorizing him "to have, use, and take all lawful ways and means for the recovery of the money due on the same," the pledgee has a right to purchase and hold for his own account the property mortgaged, at a fair judicial sale, under a decree of foreclosure, and he will hold the property subject to no other trust except to pay the suplus, if any, to the pledgor.

APPEAL from the District Court, Twelfth Judicial District, City and County of San Francisco.

On the 12th day of June, 1856, David S. Turner, who was the owner of a lot in the City of San Francisco, borrowed fifty thousand dollars of Stephen A. Wright, and gave him his note therefor, with interest at one and three quarters per cent per month, payable three years from date. Turner, on the same day, executed to Wright a mortgage on the property, to secure the note, which mortgage was, on the 18th of June, 1856, recorded in the proper book of records. The next day after the record of the mortgage Wright sold and assigned it to Benjamin R. Buckelew. This sale to Buckelew was made to enable Buckelew to raise money on the note and mortgage, but that fact was known only to Buckelew and Wright. The assignment was absolute, and was acknowledged and recorded. Buckelew, on the 22d day of November, 1856, borrowed thirty thousand dollars from James Ross, James Phelan, and Michael Phelan, and gave them his note, bearing interest at two per cent per month, payable twelve months from date; and to secure his note, assigned to them the Turner note and mortgage sold to him by Wright.

The assignment from Buckelew to Ross and the Phelans was as follows:

"This indenture, made and entered into this twenty-second day of November, A. D. one thousand eight hundred and fifty-six, witnesseth, that I, Benjamin R. Buckelew, of the County of Marin, in the State of California, in consideration of the sum of thirty thousand dollars, ($30,000,) lawful money of the United States, to me in hand paid by James Phelan, Michael Phelan, and James Ross, of the City of San Francisco, parties of the second part, the receipt whereof is hereby acknowledged, have granted, bargained, sold, assigned, transferred, and set over, and by these presents do grant, bargain, sell, assign, transfer, and set over unto the said parties of the second part, their heirs, executors, administrators, and assigns, a certain indenture of mortgage, with the note therein mentioned, bearing date the twelfth day of June, A. D. one thousand eight hundred and fifty-six, made and executed by David S. Turner to one Stephen A. Wright, and by sundry mesne conveyance and assignments assigned to me, the said Benjamin R. Buckelew, party of the first part herein, together with the bond, note, or obligation therein described, and the money due or to grow due thereon, together with the interest; which said mortgage was given to secure the payment of the sum of fifty thousand dollars, with interest thereon at the rate of one and three quarters per cent per month, payable monthly, in advance, which said mortgage was made payable in three years from the date thereof, and recorded in the office of the County Recorder of San Francisco County, in Liber Thirty-one of Mortgages, page four hundred and sixty-one, to have and to hold the same unto the said parties of the second part, their heirs, executors, administrators, and assigns, for their use and benefit, subject only to the proviso in said indenture of mortgage mentioned. And I do hereby make, constitute, and appoint the said parties of the second part my true and lawful attorneys irrevocable, in my name or otherwise, but at their own proper costs and charges, to have, use, and take all lawful ways and means for the recovery of the said money and interest, and in case of payment, to discharge the same as fully as I might

or could do if these presents were not made. But this inden-
ture is nevertheless made upon the express condition that if
the said Benjamin R. Buckelew, his heirs, executors, admin-
istrators, or assigns shall well and truly pay, or cause to be
paid, unto the said James Phelan, Michael Phelan, and
James Ross, their heirs, executors, administrators, or assigns,
the sum of thirty thousand dollars, on or before the twenty-
second day of November, one thousand eight hundred and
fifty-seven, without grace, with interest from the date hereof
at the rate of two per cent per month, payable monthly, in
advance, on the twenty-second day of each and every month,
this indenture shall be void and of no effect; it being made
for the purpose of securing the payment of the said sum of
thirty thousand dollars, with interest as aforesaid, and for
no other purpose whatever; and it is expressly agreed and
understood by and between the parties hereto, that the said
B. R. Buckelew, party of the first part, shall have the privi-
lege of continuing his said note herein given for a further
period of twelve months, upon his giving thirty days notice
previous to the parties of the second part of his intention so
to do; and in case the said James Phelan, Michael Phelan,
and James Ross, parties of the second part, their heirs,
executors, administrators, and assigns, shall collect and
receive the money due on said mortgage, hereby assigned,
they shall, after retaining the sum of thirty thousand dollars,
with the interest thereon, and their reasonable costs and
charges, not to exceed five per cent on the amount of the
recovery in that behalf expended, pay the surplus, if any
there be, unto the said B. R. Buckelew, his heirs, executors,
administrators, or assigns. And it is also agreed by and
between the parties to these presents, that the party of the
first part shall and will keep the buildings erected and to be
erected upon the lands above conveyed, insured against loss
by fire, in a sum not less than fifteen thousand dollars, and
assign the policy and certificates thereof to the said parties

53

of the second part, their heirs, executors, administrators, or assigns.

"And in default thereof, it shall be lawful for the said parties of the second part, their heirs, executors, administrators, or assigns, to effect such insurance, and the premium and premiums paid for effecting the same shall be a lien upon the said mortgaged premises, added to the amount of the said notes hereinbefore mentioned and secured by these presents; and the said party of the first part doth hereby covenant to and with the said parties of the second part, that there is now due and owing upon the said note and mortgage first above mentioned the sum of fifty thousand dollars.

"And it is hereby agreed that it shall be lawful for the said parties of the second part, their heirs, executors, administrators, or assigns, to pay and discharge, at maturity, all such taxes, or assessments, liens, or other incumbrances now subsisting or hereafter to be laid or imposed upon said lot of land and premises, and which may be in effect a prior charge thereupon to these presents, and for such payments shall be allowed interest, at the rate of three per cent per month; such payments and interest shall be considered as secured by these presents, and a charge upon said lots of land and premises, shall be repayable on demand, and may be deducted from the proceeds of the sale above mentioned. And the said party of the first part further covenants and agrees to and with the said parties of the second part, to pay all ordinary taxes and assessments which shall or may be imposed upon the mortgage or the moneys hereby secured during its continuance; and in default thereof, the said parties of the second part shall pay and discharge the same, and the sum so paid shall bear interest at the rate of three per cent per month, and shall be considered as secured by these presents, and be a lien upon said premises, and shall be deducted from the proceeds of the sale thereof above mentioned.

"In witness whereof, the said party of the first part hath

hereunto set his hand and seal the day and year first above
written.                              B. R. BUCKELEW.  [L. S.]"

This assignment was duly acknowledged and recorded on
the 24th of November, 1856.

At the time of this assignment Buckelew delivered the
Turner note and mortgage to Ross and the Phelans, who
afterwards retained the same.  On the 24th of January, 1857,
Buckelew, who had not paid Ross and the Phelans, made an
assignment to Stephen A. Wright of whatever interest
remained to him in said note and mortgage and the property
therein described, and on the 26th of December, 1860, Stephen
A. assigned the same to Attmore Wright.  Both these assign-
ments were acknowledged and recorded about the time they
were made.  Just before this action was commenced, Stephen
A. also conveyed by deed to Attmore his interest in the lot.
It does not appear that any consideration passed.  Said
Attmore was the original plaintiff in this action, but died
pending the suit, and his executor, Stephen A. Wright, was
substituted as plaintiff.  James and Michael Phelan sold
their interest in the Turner note and mortgage to Ross
before October 13th, 1857.  On the last named day Ross
commenced an action to foreclose the Turner mortgage, and
obtained a decree on the thirteenth of November following,
and on the ninth day of December following bought the
property at a Sheriff's sale made on his judgment for the
sum of ten thousand dollars.  Neither of the Wrights nor
Buckelew were made parties to this foreclosure.  On the
12th day of January, 1858, Ross received from Turner, for a
consideration of two hundred and fifty dollars, a deed of
sale, and release of the mortgaged property.  Ross com-
menced receiving the rents and profits of the property on
the 9th day of December, 1857, and on the 12th day of
January, 1858, entered into possession of the same.

On the 16th day of May, 1857, Isaac A. Moody commenced
an action against said Turner to enforce a mechanic's lien on
the lot and the buildings thereon described in the Turner

mortgage, and obtained a judgment, and had an order of sale issued to the Sheriff, who sold the property, on the 18th day of September, 1857, to said Moody, for twenty-five dollars, and gave him a certificate of purchase. Moody's lien was subsequent to the lien of the Turner mortgage. On the 11th of November, 1858, said Moody, for the sum of six hundred and fifty dollars, assigned and transferred his certificate of sale to W. W. Stow, who acted therein as the agent of Ross, who advanced the money to Stow for that purpose. On the 18th of November, 1858, the Sheriff made to Stow, as the assignee of Moody, a deed of the property, and on the 20th of April, 1859, Stow deeded to Ross. On the 20th of May, 1861, Ross borrowed from the Savings and Loan Society the sum of forty-five thousand dollars, and gave his note, payable, twenty thousand dollars in four years by equal monthly instalments, and twenty-five thousand dollars in two years, with interest, and to secure the same gave the said society a mortgage on the property. Before making said loan said Savings and Loan Society, by its officers, examined the Records of Mortgages in the Recorder's office in the City and County of San Francisco, and there saw and read the record of said mortgage of D. S. Turner to Stephen A. Wright, with the marginal references thereto and thereon, which said marginal references were as follows:

"For Assignment see Liber 30 of Morts., page 682.
"For Re-assignment see Liber 32 of Morts., page 69.
"For Assignment see this Book of Morts., page 677.
"For Assignment see Liber 32 of Morts., pp. 330, 334, 335.
"For Assignment see Liber 32 of Morts., page 584."

And also the record of the assignment of said mortgage from Benjamin R. Buckelew to Stephen A. Wright, in Liber 32 of Mortgages, page 584; and also the record of the assignment of the same from Stephen A. Wright to Attmore R. Wright, in Liber 60 of Mortgages, on page 578. They made no other or further inquiry respecting said assignments, or

any of them, and had no other notice, and were, otherwise than by the information given by said records, ignorant of the said assignment of B. R. Buckelew to Stephen A. Wright, of 24th January, 1857, and were ignorant that James Ross ever held the said note and mortgage made by D. S. Turner on any other terms or conditions than those expressed in the assignment of November 22d, 1856, from said Buckelew to said James Ross, James Phelan, and Michael Phelan, recorded November 24th, 1856, in Liber 32 of Mortgages, page 330, which record they saw and read.

This action was commenced on the 11th day of January, 1862, to have Ross declared the trustee of Wright, and to compel him to account for the rents and profits of the property. Plaintiff claimed that when the rents, over and above disbursements, paid Ross the thirty thousand dollars he loaned to Buckelew, and interest, he was entitled to a conveyance of the property from Ross, and averred that if, on an account being taken, it should be found that Ross was not paid, he was ready to pay him what was due. The Savings and Loan Society was made a defendant under an allegation that at the date of its mortgage it had notice of plaintiff's rights, and plaintiff claimed that said mortgage was subordinate and subject to his right as *cestui que trust.* Pending the action Ross died, and his executrix, Ann Ross, was substituted as defendant in his place.

The case was referred to a referee, who reported a judgment for defendants, and the Court below gave judgment accordingly. The plaintiff appealed.

The other facts are stated in the opinion of the Court.

*S. F. & J. Reynolds,* for Appellant.

Whether the assignment from Buckelew to the Phelans was a pledge or chattel mortgage, was the principal question in this case.

When the payment of money is secured by a chattel mortgage, the amount secured does not constitute a debt to

which the mortgaged property is collateral, but its payment is a condition to be performed, in default of which the title becomes absolute at law, and no debt subsists against the mortgagor. It is not, except in a very limited sense, if at all, a debt either before or after default. When the money to be paid is a subsisting liability after default, and the security is collateral to it, as it must necessarily be while there is a liability, the security is not mortgaged but pledged. And when any act is to be done on a particular day, and personal property is mortgaged to secure its performance, and default is made, the title to the mortgaged chattel which passed by the mortgage becomes absolute, and the mortgagor is discharged from performance. But when the thing assigned remains as security after the default, there must necessarily remain an obligation to perform, and the title cannot pass while the obligation to perform exists, and the property stands as security for its performance. We submit that he who holds any property as mere security for the payment of a debt, does not hold it as owner, but only has a lien upon it, and default cannot transmit the title to him. A default can only make that absolute which was before conditional. And these are principles which are not affected by the character of the property, whether real or personal. And the doctrines laid down in *Dewey* v. *Bowman*, 8 Cal. 145, fully sustains these conclusions.

Did the title in the Turner note and mortgage at once pass to Ross and Phelan, or was it merely intended as security for the note of thirty thousand dollars? If it was intended as a mortgage of the Turner note and mortgage, and to pass the legal title thereto, then all the risk of loss and chance of gain were thrown upon Ross and Phelan. If the real estate which gave them value had become worthless, Turner being insolvent, Buckelew would not then have been liable to Ross upon his note. But it would seem clear that this could never have been the intention of the parties any more in this than in the Dewey and Bowman case. The assignment, as in that case, was made to secure the payment of the debt. The

payment of the debt was not made a condition subsequent to the absolute vesting of the securities, but the securities were made collateral to the debt, to make sure its payment after default. The question then presents itself, whether the doctrines laid down in *Dewey* v. *Bowman*, and the distinctions therein taken as to mortgages and pledges, as stated therein, are now open to controversy. That case has been relied upon as properly stating these distinctions for more than ten years. It has been repeatedly referred to as authority by this Court while this case has been under consideration before it. In *Gay* v. *Moss*, 24 Cal. 125, it is referred to as authority upon this precise question. We respectfully submit that the distinctions taken in that opinion should not now be departed from, and more especially as they place all securities upon a common level and reasonable grounds. It was because a mortgage of real estate was made only to secure the payment of money, that it was denied the effect of a conveyance at law, and held to be a mere pledge. (*McMillan* v. *Richards*, 9 Cal. 411.) And it is respectfully submitted that no possible reason can exist why in the case of personal property, held as security, a payment of the debt, whether before or after default, will not operate as an extinguishment of the rights of the creditor in the property held as security, as well as in the case of real property held in the same way. It seems difficult to understand how the mortgagee of a chattel, who has already a title which has become absolute by default, can become the purchaser at any sale of that property. Whose interest in the chattel is it that is sold, that of the mortgagee or mortgagor? If it is the mortgagor's interest, then he must have the title, which makes it not a mortgage but a pledge. It is not disputed that Ross might have made Wright, the then owner of the pledged property, a party to the foreclosure suit, and sought by his bill and obtained by his decree a complete foreclosure of the mortgage, as against Turner, and the pledge of it, as against Wright. Now, we submit that upon the terms of the assignment to Ross there is no doubt that Wright, the assignee of

Buckelew, might have paid or tendered Ross his money on the first day of November, 1857, after default, and thereby discharged Buckelew's obligation to Ross, and have been substituted as a party to the foreclosure suit, or otherwise restored to the exact position that he would have occupied if he had paid the thirty thousand dollar note before default. But not if it was a mortgage, for then he could not pay his debt and release his security without going into a Court of equity. The decree then would have directed a sale of the mortgaged land, which alone gave value to the pledge, and that out of the proceeds Ross be first paid his thirty thousand dollar note; second, that Wright be paid the balance, to the amount due on his fifty thousand dollar note; and finally, that the balance after paying the fifty thousand dollar note be paid to Turner. And the usual clause would also have been inserted, allowing any of the parties to purchase at the sale. For each would have had equal opportunity to protect his interests at such sale. But not so when the sale is made without any demand of the pledgor, or notice that the only thing which gave value to the chattel would be sold. In *Gay* v. *Moss*, this Court hold that the assignment is a pledge, because it was made only as security collateral to a debt. In *Dewey* v. *Bowman*, it is held that when chattels stand as security for the payment of a debt, which subsists as such after default, it cannot constitute a mortgage. A mortgage is more than a mere security—it is a conditional sale of the property, not a lien upon it. It is, in a very limited sense, security before default, but not at all afterwards.

*Patterson, Wallace & Stow*, for Respondents.

The assignment to Ross being a mortgage, and not a simple pledge, vested the title to the Turner note and mortgage in Ross. The note of Buckelew to Ross, to secure which that assignment, by way of mortgage, was made, fell due on the 27th of November, 1857. It not being paid on that day, the title of Ross to the Turner note and mortgage became abso-

lute. "A mortgage is a pledge, and more; for it is an absolute pledge, to become an absolute interest if not redeemed at a certain time." (*Jones* v. *Smith*, 2 Vesey, Jr. 378; 2 Story's Eq. Jur., Sec. 1,030; Edwards on Bailments, 192; *Ferguson* v. *Lee*, 9 Wend. 259.)

Stress is laid upon the circumstance that when Ross proceeded to foreclose the mortgage against Turner, he did not make either Buckelew or Stephen A. Wright or Attmore R. Wright parties to the foreclosure suit, and it is claimed by the appellant that his position or right, as now asserted here, is different and better than it would have been if Buckelew or his assignee for the time being had been made a party to the foreclosure proceedings. We submit that if Buckelew or Wright had, either of them, been a party to the foreclosure suit, the right to redeem from the transfer of the mortgage to Ross would have been wholly unaffected by such foreclosure suit, and the relative position of Ross and Wright, after the proceedings to foreclose had terminated in a decree, would have been wholly unaffected by the decree. Buckelew or his assignee had a right originally to redeem from the assignment of the Turner note to Ross. After a decree foreclosing that mortgage, Buckelew, or his assignee, though made a party to the decree, would have neither gained nor lost any right thereby. In the case of *Hoyt* v. *Martense*, 16 N. Y. 233, this proposition was distinctly presented and decided by the Court of Appeals of New York. Upon this point the Court say:

"But I do not understand how or upon what principle the rights of Hoyt, the plaintiff in this action, are affected by his being a party to the foreclosure suit. The assignment to Martense was in effect a mortgage of the mortgage. The object of the action in favor of Hoyt and Martense was solely to foreclose the equity of redemption of Corbitt, the original mortgagor, in the mortgaged premises, and has no reference whatever to the right of Hoyt to redeem the mortgage by

payment of his debt to Martense.   Hoyt's right of redemption was wholly unaffected by the foreclosure and sale."

The title of Buckelew, and of his assignee, Stephen A. Wright, therefore, was, irrespective of any foreclosure proceedings, divested on the 27th of November, 1857, and turned into a mere right to redeem, "which may be asserted by the mortgagor, if he brings his bill to redeem within a reasonable time."   (2 Story's Eq. Jur., Sec. 1,031.)

On the 27th of November, 1861, the note of Buckelew to Ross became barred by lapse of time; on that day the right of Buckelew or his assignee to redeem from the mortgage to Ross became likewise barred.   The remedies were mutual and concurrent, and they ceased at the same time.   (*Waterman* v. *Brown,* 31 Penn. State, 163.)   "The right to foreclose and the right to redeem are reciprocal and commensurable." (*Cauffman* v. *Sayre,* 2 B. Monroe, Ky. 206.)   And this language of Mr. Chief Justice Robertson is quoted approvingly by Mr. Hilliard in his work on mortgages. (2 Hill. on Morts. 1.)   In *Koch* v. *Briggs,* 14 Cal. 262, this necessary mutuality and reciprocity are recognized by Mr. Chief Justice Field. (See, also, *Lord* v. *Morris,* 18 Cal. 482; *McCarthy* v. *White,* 21 Cal. 495; *Grattan* v. *Wiggins,* 23 Cal. 34, 35; *Cunningham* v. *Hawkins,* 24 Cal. 403.)

But let us, for the purpose of the argument merely, concede that the transaction between Buckelew and Ross was a pledge pure.   It was a pledge to be controlled in its disposition by the express written agreement made on the 22d of November, 1856, in which it was stipulated that the pledgor might redeem by the 27th of November, 1857.   On that day Ross' right of action against Buckelew to collect the debt accrued, and on the 28th of November, 1861, that right became barred by lapse of time.   The corresponding right of Buckelew to maintain an action to redeem the pledge became in like manner barred on the 28th day of November, 1861, and we are not able to see why the principle announced in *Cunningham* v. *Hawkins, supra,* that remedies as between

mortgagor and mortgagee are mutual, should not apply as well to pledgor and pledgee, for the pledgor, like the mortgagor, has a "mere right of redemption." (*Hart* v. *Burton*, 7 J. J. Marsh. 323; *Thornhill* v. *Gilmer*, 4 S. & M. 163.)

At the October Term, 1867, Mr. Chief Justice CURREY delivered the following opinion, in which Mr. Justice RHODES and Mr. Justice SANDERSON concurred, Mr. Justice SAWYER and Mr. Justice SHAFTER dissenting:

The counsel for the respective parties have treated the assignment of the Turner note and mortgage by Buckelew to Ross and the Phelans as an assignment of personal property only; and whether it was merely a pledge or a chattel mortgage in effect has been very fully and elaborately discussed. The appellant's counsel assume that it was a pledge pure and simple; while the respondents' counsel maintain that it was a mortgage, and that upon the happening of the default of Buckelew to pay his debt at the time agreed upon, the title of Ross to the securities assigned became absolute. These opposing positions seem to be taken by the counsel for the respective parties because the consequences which would result in the one case are supposed to be quite diverse from those that would follow in the other. In the one case, it would seem to be agreed in argument, the plaintiff would be entitled to relief, as against Ross, at least; while in the other, it would result that the plaintiff's complaint should be dismissed.

Assuming it to be necessary to determine whether the assignment should be regarded as of the nature of a pledge of personal property as security for the payment of a debt merely, or as of the nature of a chattel mortgage, which passed the title of the assigned property, subject to be defeated by performance of Buckelew's engagement at the day stipulated, we are, from a consideration of the entire instrument, forced to the conclusion that the parties designed it should be a pledge and not a chattel mortgage, to which

the common law incidents of such a mortgage were annexed. This result of judgment is necessitated from the expressed intentions and purposes of the parties. The defeasance clause, standing alone, declares upon what conditions the sale and assignment of the Turner note and mortgage should be void and of no effect; but an additional clause follows immediately, declaring the assignment to be made for the purpose of securing the payment of the said sum of thirty thousand dollars, with interest at the rate therein specified, and for no other purpose whatever; and still following this, it is provided that in case Ross and the Phelans, "their heirs, executors, administrators, or assigns, shall collect and receive the money due on said mortgage hereby assigned, they shall, after retaining the sum of thirty thousand dollars, with interest thereon and their reasonable costs and charges, not to exceed five per cent on the amount of the recovery in that behalf expended, pay the surplus, if any there be, unto the said B. R. Buckelew, his heirs, executors, administrators, and assigns." The same instrument contains a provision constituting the parties of the second part—Ross and the Phelans—Buckelew's attorneys, and authorizing them to have, use, and take all lawful ways and means for the recovery of the money and interest secured by the note and mortgage assigned, and, in case of payment, to discharge the same as fully as he might or could do, if the assignment were not made.

There is a clear and obvious difference between a pledge and a chattel mortgage. By the pledging of personal property by one to another as security for some debt or engagement, the pledgee acquires only a special property in the thing pledged, while the general property remains in the pledgor. (Story on Bail., Sec. 287; Edw. on Bail., 188–201; 2 Story's Eq. Jur., Sec. 1,030; 2 Kent, 577.) A chattel mortgage is a conditional transfer or conveyance of the property itself, and if the condition be not duly performed the whole title vests absolutely at law in the mortgagee, (2 Story Eq. Jur., Sec. 1,030; *Langdon* v. *Buel,* 9 Wend. 80,) and the

mortgagee may, after his title has become absolute, have his action, if necessary, to obtain the possession of the property. (*Patchin* v. *Pierce*, 12 Wend. 61; *Fuller* v. *Acker*, 1 Hill, 473.) Delivery accompanies a pledge, and is essential to its vitality. Negotiable instruments, choses in action, stocks, etc., may be so pledged as to be made available to the pledgee for the satisfaction of the debt secured. (Story on Bail., Secs. 290, 297; Edw. on Bail., 197; *Wilson* v. *Little*, 2 Comst. 443.) The pledgee may retain the pledge until his debt is paid, but if the debt be not paid when due, or after due, that fact does not work a forfeiture of the pledged property. (Edw. on Bail. 201.) If no time of redemption be fixed by the contract, the pledgor may redeem at any time; and though a day of payment be fixed, he may redeem after the day. He has his whole lifetime in which to redeem, provided the pledgee does not call on him to do so. (4 Kent, 138; Edw. on Bail. 198.) The pledgee may have the property sold for the payment of the debt secured by it, after calling upon the pledgor to redeem, by a judicial decree, or he may himself sell the property after due notice to the owner. (Story on Bail., Secs. 308, 309, 310; Edw. on Bail. 249; *Wilson* v. *Little*, 2 Comst. 243; *Wheeler* v. *Newbould*, 16 N. Y. 392; *Mauge* v. *Heringhi*, 26 Cal. 579; *Wilson* v. *Brannan*, 27 Cal. 270.)

It is evident, from a view of the entire instrument of assignment, that the parties did not understand nor intend that Buckelew should become divested of all right and interest, even at law, in the money secured by the Turner mortgage, in the event that his own debt was not paid at maturity, else why did they provide for the payment to Buckelew of a surplus which could only arise after the payment of the Turner note or the sale of the mortgaged premises and the payment of the debt of Buckelew?

Whether a particular transaction is a mortgage or a pledge is often a very nice question; and being a question of difficulty, Courts have in many instances used the terms "mortgage" and "pledge" indifferently, when not necessary to observe the distinction between them. But when the real

character of the transaction is manifested by the language of the parties to the contract disclosing their purpose and intention, all that a Court has to do is to recognize its real and true character, and to carry into effect by an appropriate decree the parties' declared intention.

If the appellant's position that the transaction was one of pledge be incorrect, it does not result that it was in effect one of mortgage of personal property or of a chose in action, but rather that it was an assignment in trust. In *Cooper* v. *Whitney*, 3 Hill, 101, where a deed of lands was executed and a covenant made between the parties at the same time, declaring that the grantee should sell the lands and pay certain of the grantor's debts and return to him the surplus, but containing no reservation of a right to redeem, the Court, by Mr. Justice Bronson, held that it was not a case of sale and purchase, but that the transaction constituted an assignment or conveyance in trust, and that the widow of the trustee was not dowable of the estate which he received and held in trust. "Both real and personal property, as well as choses in action," says Judge Willard, "may be assigned in special trust. The most usual object of such assignment is the distribution of the property of the assignor among his creditors, toward the payment and satisfaction of their debts." (Willard's Eq. Jur., 459, 460.) If a debtor may assign his personal property and choses in action in trust, for the purpose of paying his creditors generally, we see no reason why he may not do the like to pay a single creditor, though the assignee be that creditor. Where the assignment in such a case is made to a person not a creditor, the creditors for whose benefit the assignment is made become interested at their election in the trust property, and to the extent of their debts against the assignor are beneficiaries, because he is interested in the proper disposition of the property assigned, by which his debts are to be paid, and in the surplus, if any remains. So, when the assignment is made to a creditor with authority to sell the property or to collect the amount due on choses in action, and to apply the

proceeds and avails thereof to the payment and extinguish-
ment of the debt due from the assignor, and to return to
him the remaining surplus, the assignor has, upon the same
principles and considerations, an interest in the due and
faithful execution of the trust.   In our judgment, the assign-
ment was of the nature of a pledge of the property assigned.
From its terms it is clear that Buckelew retained an interest
in the note and mortgage assigned.   His assignees accepted
them in pledge for their own security and also in trust for
their assignor, first to discharge by the proceeds and avails
of the securities the debts due them, and then to account
and pay to him whatever there might remain of the amount
which it was contemplated they should collect of Turner.
By the contract of assignment the assignees were not author-
ized to accept from him to the prejudice of Buckelew less
than the amount due on the note secured by the mortgage.

When Ross commenced his action against Turner to
enforce the payment of the debt due from him and to fore-
close the mortgage, the relation between him and Wright,
to whom Buckelew had re-assigned his right and interest in
the note and mortgage, was that of a trustee and *cestui que
trust*, and the relation did not become extinguished by the
foreclosure of the mortgage and the sale of the mortgaged
premises, at which sale he became the purchaser.   Ross
acquired an interest by his purchase under the foreclosure in
the mortgaged premises.   This interest became substituted
in his hands for and in the place of the Turner note and
mortgage, and from thence he held the interest thus obtained
as a substituted security for the payment of the debt due him
from Buckelew, and in trust for the benefit of the owner of
the note and mortgage, through and by means of which it
was acquired.   The conveyance of the property to him by
Turner on the 12th of January, 1858, he received in his trust
capacity, and thenceforth held the legal title to it for the
benefit of the *cestui que trust*, as well as for his own security.
The acquisition by him of the interest which passed by the
sale under the judgment of Moody, stands in the same posi-

tion and inured to the benefit of the parties as they stood related to each other and to the property as the substituted security for the payment of what was due to Ross. It is a fundamental doctrine of equity that a trustee can gain no advantage to himself to the detriment of those for whom he holds in trust. This rule is applied to the transactions of the trustee, according to the nature and circumstances of different cases, in such manner as to give efficacy to the principle on which it is founded. The objects of the rule are, to secure fidelity on the part of the trustee and to preserve the interests of those whose rights are confided to his care. (*Green* v. *Winter*, 1 Johns. Ch. 36; *Parkist* v. *Alexander*, 1 Johns. Ch. 397; *Holdridge* v. *Gillespie*, 2 Johns. Ch. 33; *Van Horne* v. *Fonda*, 5 Johns. Ch. 409; *Slade* v. *Van Vechten*, 11 Paige, 22; *Fox* v. *Macketh*, 2 Bro. Ch. Cas. 400; Fonblanque's Eq. Jur., B. 2, Ch. 7, Sec. 7.)

Neither Buckelew nor Wright was made a party to the foreclosure suit against Turner, and as a consequence of the omission the interest of Wright in the securities was not foreclosed. Through or by means of the note and mortgage, Ross obtained Turner's title in the premises and the possession of the property, which, as we have already observed, he thereafter held as a substituted security for the payment of the debt due, united with an interest of which he could not be divested until he was paid his dues; but when paid, his right to what remained of the property ceased, and it was his duty to transfer it to his *cestui que trust*, to whom it in equity belonged. What more could Ross in conscience have asked than payment of all that was due him? Upon what just principle could Wright be deprived of what remained of the property which Ross held as security after the latter was fully paid?

The right of the appellant to call upon Ross to account, and upon it appearing that he has received the amount due him to convey to the appellant the premises, is controverted on the ground that the claim asserted was barred by the Statute of Limitations at the time this suit was commenced.

To determine this point it is necessary to consider the relations of the parties in respect to the substituted security. The position of Ross in this respect to the premises was not adverse to, but in consonance with the equitable right and interests of the *cestui que trust.* Ross had the right to retain the substituted security until his demand was paid, and until indemnified for necessary expenditures respecting the property. This was an elemental condition of the contract of assignment in pledge, and even if his demand against Buckelew had not been paid in whole or in part until more than four years had expired after it become due, he was after that entitled to hold the property assigned or its substitute as his security, because such was the effect of the contract of the parties by which the trust was created. (*Kemp* v. *Westbrook,* 1 Vesey Sen. 278.) In cases of express trust, the Statute of Limitations does not begin to run in favor of the trustee so long as the trust continues and is not denied, for the reason that the possession of the trustee subsists in subordination to the rights of the *cestui que trust.* But if the trust is disavowed by the trustee, and he claims the trust property as his own, adversely to the *cestui que trust,* and this is brought to the knowledge of the latter, the statute will begin to run from that time. (*Kane* v. *Bloodgood,* 7 Johns. Ch. 123; *Boone* v. *Chiles,* 10 Peters, 223; *Keaton* v. *Greenwood,* 8 Geo. 103; *Kemp* v. *Westbrook,* 1 Vesey Sen. 278; Angell on Limitations, Sec. 472.)

Ross, it appears, acquired the legal title to the premises in question on the 12th of January, 1858, and then entered into possession. His possession of and claim to the property was not adverse before that day, nor did his acquisition of the title and possession on that day necessarily or even presumptively make his position in respect to his trust and the trust property adverse to the *cestui que trust.* The trust could therefore subsist, to every legal and equitable intent, as well as before then. The referee found that on the 29th of May, 1861, Ross was in open, notorious, and exclusive possession

of the premises, by his tenants, claiming title thereto adverse to the plaintiff and those under whom he claimed. It does not appear from anything in the case that the position and possession of Ross was of an adverse character before then, and as the finding specifies that such was the attitude of Ross on that day, we must presume it in this respect warranted by the evidence in the case, and negatively that he did not hold adversely before that time.

The case of *Cunningham* v. *Hawkins*, 24 Cal. 403, is relied upon by the respondents in support of their plea of the Statute of Limitations, and seems to be regarded by them as strictly applicable to the case at bar. We do not so regard it. In that case we held that a mortgagor could not maintain his bill to redeem after the demand to secure which the mortgage was executed had become barred by the statute, simply on the ground that the respective rights of mortgagee and mortgagor with regard to a foreclosure on the one hand and a redemption on the other, are to be treated as mutual. These respective rights cannot exist independently of each other, because the existence of the one involves that of the other, and as soon as the bar to the one accrues, the other, of consequence, is also barred. This results from the relation of the parties, which is a peculiar one, and perfectly *sui generis*. In the case of a continuing trust created by agreement, or resulting from it, the respective rights of the parties are conserved by and co-exist with the agreement, and consequently each may have his remedy to secure its object, while the trust relation subsists; and even after it may be disavowed or denied, until barred by statute or lapse of time. The rights and remedies of the parties in such case are reciprocal and commensurable.

When the relation of trustee and *cestui que trust* is created by agreement or by the act of the parties in respect to a particular subject matter, and it appears to have been intended that the trust should continue until the object of it should be accomplished, then it of necessity must subsist until its object is accomplished or the relation is dissolved

by some act or declaration or course of conduct adverse in its nature to the continuance of the trust and the trust relation; and further, until the party whose right is denied has knowledge or can be presumed to be aware of such adverse act or declaration or course of conduct.

The trust assumed by Ross was by the contract to continue and subsist until he was paid the debt due him, and the remainder of the property in his hands, or to come to his hands, was returned to his *cestui que trust.* By the contract of assignment and the law applicable and governing such cases, Ross was invested with the right to hold the property assigned until he could make out of it, or by means of it, enough to pay him his dues, unless otherwise paid; and the enjoyment of this right was not limited by the period during which he might have maintained an action at law on the note of Buckelew, because the effect of the assignment was to continue his right beyond such period, and Wright, to whom Buckelew had assigned the Turner note and mortgage, had the correlative right to redeem the pledged property, or that which Ross held in trust as its substitute until he assigned his interest therein to his son Attmore, who then succeeded to such right.

On the 29th of May, 1861, Ross borrowed of the Savings Loan Society forty-five thousand dollars, which he agreed to repay, with interest, by installments, and to secure which he mortgaged to said society the premises in question. The plaintiff alleged in his complaint that the Savings Loan Society had notice at the time this loan was made of the right and interest of the plaintiff, and therefore that the society's rights and interests in the premises are subject and subordinate to the right and interest of the plaintiff—that is, that the society is in no better position in respect to the property than Ross was when he executed this mortgage. Such is the condition of the Savings Loan Society, provided the officers and managers of its concerns had notice, constructive or actual, of the plaintiff's rights and interests in

the premises, or sufficient information to put them on inquiry respecting the same.

It does not appear from the finding and report of the referee that the Savings Loan Society had actual knowledge of the rights and interests of the plaintiff in the premises; and whether the record of the several assignments of the mortgage imparted notice to the society of the plaintiff's interest in the trust property, depends upon a construction of the several statutes having relation to the recording of instruments in writing affecting or creating an interest in real estate. In our view of the question presented, it is not necessary to decide whether the statutes make any provision for the recording of assignments of mortgages, nor whether the record of an assignment of a mortgage, acknowledged in due form and recorded, operates as notice to subsequent purchasers and mortgagees of the existence of the assignment and its contents. We shall consider the question upon the hypothesis that, if the Savings Loan Society are chargeable at all with notice of the equitable rights of the plaintiff, it is on the ground that its officers had information which imposed on them the duty to inquire and investigate before the money of the society was loaned to Ross, in order to preserve to itself the character and rights of a subsequent *bona fide* mortgagee.

The referee found and reported that before the Savings Loan Society made the loan to Ross, its officers examined the records of mortgages in the Recorder's office of the county, and there saw and read the record of the mortgage of Turner to Stephen A. Wright, in Liber 31 of Mortgages, with the marginal references thereto and thereon, specifying the books of mortgages where the several assignments of the mortgage might be found as recorded; and also saw and read the record of the assignment of the mortgage from Buckelew to Ross and the Phelans, and the record of the assignment from Buckelew to Stephen A. Wright, and the record of the assignment from Stephen A. to Attmore R. Wright, in the books of mortgages which are mentioned. It

is further found and reported that the officers of the society made no other or further inquiry respecting the assignments, and had no other notice, and were, otherwise than by the information given by said records, ignorant of the assignment of Buckalew to Stephen A. Wright, and also were ignorant that Ross ever held the Turner note and mortgage on any other conditions than those expressed in the assignment of Buckelew to Ross and the Phelans.

With regard to what shall be sufficient to put a party on inquiry, no definite rule can be laid down. It must be something more than vague rumor, and perhaps each case must depend upon its own circumstances and the position of the persons concerned in it. (2 Lead. Cases in Eq., Part I, p. 35.) The general rule is, that what is sufficient to put a party on inquiry is good notice in equity; that is, where a man has sufficient notice to lead him to a fact, he shall be deemed conusant of it. (2 Lead. Cases in Eq., Part I, p. 35; *Green* v. *Slayter*, 4 Johns. Ch. 46; *Jenkins* v. *Eldredge*, 3 Story, 325.) And a party thus informed cannot become a *bona fide* purchaser or mortgagee when knowledge of the truth would render him otherwise. (*Pendleton* v. *Fay*, 2 Paige, 205; *Pitney* v. *Leonard*, 1 Paige, 461; *Hawley* v. *Cramer*, 4 Cow. 722; *Tuttle* v. *Jackson*, 6 Wend. 213; *Williamson* v. *Brown*, 15 N. Y. 354.)

The officers of the Loan Society saw and read in the records of mortgages what purported to be copies of the various assignments of the Turner note and mortgage. They were treating with Ross with reference to loaning him money, for which he proposed to secure them by the mortgage on the property in question. Would prudent men, having this information and being interested, have neglected to inquire respecting the matter indicated by what these officers saw and read? We think that which they saw and read was well calculated to put them on inquiry; especially so as they were dealing with one of the parties to the assignment, under which he had acquired the right which he had; from whom, by inquiry, we must presume they would have

ascertained all he knew in the premises. The means of knowledge was conveniently accessible, and we are of the opinion they should have made the inquiries suggested by what they saw and read.

The referee found, as we have seen, that the officers of the Loan Society were ignorant, otherwise than as informed by the records—that Ross never held the Turner note and mortgage on any other conditions than those expressed in the assignment of Buckelew to Ross and the Phelans. From this it would seem that the Society had notice of the conditions on which that assignment was made. Such, at least, is the import of the finding. The Society must therefore be deemed to have loaned their money to Ross and taken from him a mortgage on the premises to secure it with knowledge, to a legal intent, of the outstanding equitable rights and interest of the *cestui que trust.*

Benjamin R. Buckelew died in November, 1859, leaving a last will and testament. His executrix gave the notice prescribed by the statute to creditors of the decedent and of his estate, to exhibit their claims and the necessary vouchers to her at her residence, which was specified in the notice, within ten months thereafter. The ten months expired before the 1st of January, 1861. No claim was ever made or presented to the executrix for the payment of the note which Buckelew gave to Ross and the Phelans; nor did they or either of them ever exhibit any claim whatever against Buckelew deceased or against his estate. The parties entered into a stipulation admitting these facts, and agreed that the facts admitted should be taken and treated as if duly and properly pleaded, and that the plaintiff might avail himself of any and all Statutes of Limitations to the same extent and effect as if they had been properly pleaded. The plaintiff availing himself of the matters stipulated, takes the ground that by the omission to present the note to the executrix as a claim against the estate of Buckelew, Ross lost the right to the rents and avails of the property which he held in trust and as security for the payment of the debt of Buck-

elew, because the claim became barred by reason of the failure to present it, and the right to maintain an action thereon was lost.

If the creditor of a deceased person would preserve his claim against the estate of the deceased, to be paid in the course of the administration, he must present it to the personal representative of the deceased, as required by the statute, otherwise it becomes barred forever—that is, it becomes barred as a claim against the estate, and no action can be maintained thereon. (Probate Act, Chap. VI.) But if he have in his possession property which by contract he holds as his security for the payment of the amount due him, we do not understand he loses his right to retain it in pursuance of the terms of his contract, because he fails to present his claim against the estate. He may not desire to look to anything for payment except that which he has in possession, and which he has a right to retain until his demand is satisfied. A person making a claim against an estate is bound to establish it by affirmative evidence if it is disputed by the executor or administrator, but a creditor of a deceased person having by contract the rightful possession of property as security for the payment of a debt, may retain that possession until it is made to appear that his possession is no longer rightful. Not having presented his claim to the executrix, Ross lost his right to demand payment of the debt or any part of it out of the general estate of the deceased; and this we think was the extent of his loss by reason of his omission to present such claim.

The appellant's counsel make a further point, which proceeds upon another and different principle, which is that Ross was in duty bound to present the demand against Buckelew as a claim against his estate in order to preserve it as a security for Wright, to whom Buckelew was indebted, or his estate was to become indebted, by reason of the assignment made by Buckelew to Ross and the Phelans of the Turner note and mortgage, which was, as between Buckelew and Wright, the property of the latter. If Ross was apprised of

the relations between Buckelew and Wright, it would have been his duty to have given the latter notice of the payment and satisfaction of the debt due him from Buckelew when that event transpired, in order that Wright might have been enabled to present his claim against Buckelew's estate, as provided in section one hundred and thirty of the Probate Act. But it is not clear that Ross had notice of the relations existing between Buckelew and Wright. The referee has in effect found that he had not, and hence he should not be charged with consequences which might follow because of the omission, under other circumstances.

It was competent for Attmore R. Wright, who had succeeded to the equitable rights and interests of Buckelew and Stephen A. Wright, to have and maintain this suit. Being ignorant of the amount of the rents and profits obtained by Ross from the property, and consequently whether he had yet received sufficient to satisfy the amount due him, the *cestui que trust* was entitled to have his action to compel Ross to account, and if paid, or when paid in full, to convey and surrender the land which he held for his indemnity. If anything remained to be paid, an account was necessary for the purpose of ascertaining how much, in order that Attmore might be enabled to tender the amount still due, and thus place himself in a position to demand a conveyance of the property to him. (*Kemp* v. *Westbrook*, 1 Vesey, 278.)

Whenever Ross received rents or other income from the property, it was his duty to make immediate application of the same, first to the payment of necessary outlays and disbursements in preserving and protecting the property, and then to the payment *pro tanto* of the Buckelew debt, and if he neglected to do so equity will make the application. From the report of the referee it appears that Ross had received rents, in excess of disbursements, amounting in the aggregate to the sum of fifty-six thousand three hundred and forty dollars and fifty-four cents. At what precise times a large portion of these rents were received does not appear. When the necessary facts in relation thereto may be ascer-

tained, then the amounts received should be applied as above indicated. And if it shall appear that the Buckelew debt has been fully paid, or when it shall be so paid, the plaintiff will be entitled to a conveyance of the property executed in due form of law.

The decree is reversed and the cause remanded for further proceedings.

A rehearing was asked and granted after Mr. Chief Justice CURREY and Mr. Justice SHAFTER had left the Bench, which came on to be heard at the October Term, 1868, when the following opinion was delivered by Mr. Justice CROCKETT:

The principal question in this case is, whether the instrument from Buckelew to Ross and Phelan was a pledge or a chattel mortgage, or a mere assignment in trust, as contradistinguished from either. The line of distinction between a pledge and chattel mortgage, whilst well defined in theory, is sometimes difficult of application to the facts of the transaction. This case presents a striking illustration of the difficulty.

The chief distinctions between the two at common law were, that in a pledge the title did not pass to the pledgee, who held only a lien on the property, and in all cases the possession must accompany the pledge; whilst by a chattel mortgage the title of the mortgagee became absolute at law, on the default of the mortgagor, and it was not essential to the validity of the instrument that possession of the mortgaged property should be delivered. Nevertheless, when the transaction is evidenced by a written instrument, as in this case, it often becomes difficult to decide, on the face of the paper, whether it was intended as a pledge or a mortgage. Whether it be the one or the other, the object and design of it, in all cases, is to secure the payment of money, or the performance of some act by the maker of the instrument, or some one else, for whom he undertakes. But whilst the

general office to be performed by each is the same, to wit: to secure the payment of money or the performance of some other act, the consequences resulting from a failure to perform are widely different in the two cases. In the case of a pledge the title remains in the pledgor, after condition broken, with a right to redeem at any time before a sale of the property; and if the property be sold by the pledgee, in satisfaction of his demand, he cannot become the purchaser at his own sale. But in the case of a chattel mortgage, the title of the mortgagee became absolute at law, on the default of the mortgagor; and on the foreclosure of the mortgage, the mortgagee was at liberty to become the purchaser. In this and similar cases the difficulty lies in determining, on the face of the instrument, whether the parties intended it to be a pledge or a mortgage. There is no set form of words for either, and the intent is to be deduced from the whole instrument, and all its provisions taken together.

The subject matter of the transaction in this case was a note and mortgage on real estate made by D. S. Turner, and which were placed by Buckelew in the hands of Ross and Phelan, to secure the payment to them of Buckelew's note for thirty thousand dollars, with interest.

There is no room for doubt that a note and mortgage of that character may become the subject of either a pledge or mortgage. They are but choses in action, and it is well settled that choses in action may be pledged. (Story on Bailments, Secs. 290–297; Edw. on Bailments, 197; *Wilson* v. *Little*, 2 Comst. 443.)

To make such a pledge available to the pledgee, there must necessarily accompany the pledge a power to assign the note and mortgage, in case of a sale of them, and to release the mortgage on satisfaction of it, otherwise it would not be possible for the pledgee, on a sale, to convey the legal title to the purchaser, or on a satisfaction of the mortgage to release it of record. But the instrument in question contains more than a mere authority from Buckelew to assign the note and mortgage to a purchaser, and to discharge the mortgage on

satisfaction. It contains also a formal assignment to Ross and Phelan, by which they were invested with the legal title, and with full authority to take all proper steps for collection of the debt, and the release of the mortgage on the satisfaction thereof.

So far the instrument partakes of the character of a chattel mortgage, which, in the granting part, conveys the legal title to the mortgagee, and which is followed by a defeasance declaring the conditions on which the conveyance is to become void. This instrument contains both the absolute grant or assignment and a defeasance in the usual form. But the defeasance is followed by a provision to the effect that the instrument is "made for the purpose of securing the payment of the said sum of thirty thousand dollars, with interest as aforesaid, and for no other purpose whatever;" and it is insisted by counsel that these words repel the idea that the instrument was intended as a mortgage, and go strongly to fortify the proposition that it was only a pledge, or at most an assignment in trust. But we are unable to perceive the significance of these words in that light. Whether it be construed to be a pledge, a mortgage, or an assignment in trust, these words would have equal significance, and would be equally true as applied to the transaction. Whatever we may term the instrument, and however we may classify it, it is obvious that it was "made for the purpose of securing the payment of the said sum of thirty thousand dollars, with interest as aforesaid, and for no other purpose whatever." The whole instrument, even without the aid of these words, establishes clearly that it was intended only as a security, and for "no other purpose whatever." This provision, therefore, can have no significance in determining the character of the instrument. It is the common practice to recite in mortgages that the instrument is intended only as a security, though these words are superfluous when the intent sufficiently appears from other portions of the instrument.

There is also a provision to the effect that on the collection by Ross and Phelan of the note and mortgage made by Tur-

ner, they are to account to Buckelew for the excess, after retaining the thirty thousand dollars and interest due from Buckelew, together with the costs of collection; and counsel maintain that this provision proves that Buckelew was to retain an interest in the note and mortgage, even after default made in the payment of his own note; and hence that the transaction was a pledge and not a mortgage. This argument is founded on the fact that, in case of a pledge, the title remains in the pledgor, even after default made; whereas, in the case of a chattel mortgage, the title of the mortgagee becomes absolute at law on the default of the mortgagor. Hence the argument that, inasmuch as the instrument provides for a payment of the surplus to Buckelew, it follows, as it is claimed that he retained an interest in the property after default made, and that for this reason it was a pledge, and not a mortgage.

This argument, however, is more specious than sound. If it had been in strict form a chattel mortgage, with a provision for the payment of the surplus to the mortgagor, would this of itself have converted it into a pledge? We think not. For whilst the title of the mortgagee would become absolute *at law* on default made, it is not controverted that the mortgagor could still redeem in equity. The provision for payment of the surplus is only expressing in words a right secured to the mortgagor by a Court of equity, if the instrument had been silent in that respect. It is none the less a mortgage because the parties have expressed in terms what a Court of equity would otherwise have implied, to wit: that the mortgagor was entitled to the surplus, after payment of the mortgaged debt, interest, and costs.

We are fortified in the opinion that the instrument was intended as a mortgage, by the fact that it is so denominated by the parties to it. One of the provisions is that it shall be lawful for Ross and Phelan to effect insurance on the buildings included in the mortgage from Turner, and that the premium paid therefor "shall be a lien upon the said *mortgaged* premises, added to the amount of the said notes hereinbefore

mentioned and secured by these presents." The "mortgaged premises" referred to must of necessity be the note and mortgage of Turner, and not the real estate included in the Turner mortgage, on which it was not in the power of Buckelew to impose a new lien in favor of Ross and Phelan.

On the whole, we conclude that the instrument in question has all the distinguishing characteristics of a chattel mortgage, and was so intended by the parties to it. It follows that Ross had the lawful right to purchase, for his own account, at the foreclosure sale, and in the absence of fraud, the purchase inured to his own benefit.

But if the instrument be not, strictly speaking, a chattel mortgage, we are, nevertheless, of opinion, that on a fair construction of it, under whatsoever classification it may fall, Ross had the right to purchase and hold, for his own account, the property in the Turner mortgage, at a fair judicial sale, under the decree of foreclosure.

The legal title to the note and mortgage was not only conveyed to him, but he was expressly authorized "to have, use, and take all lawful ways and means for the recovery of said money and interest." This included the power to collect it by legal process, and to do whatever was proper and necessary to make the mortgaged property available for the payment of the debt. It was clearly within the contemplation of the parties that the foreclosure of the mortgage and a sale of the mortgaged property might become necessary, and Ross was clothed with full authority to accomplish that result. Was it contemplated by the parties, in the event of a foreclosure of the Turner mortgage, that Ross should not have the right to purchase the property for his own account, at a fair judicial sale? Was it within the scope of the contract, that in case of a purchase by him, at such sale, he was to hold the title only as a security for his debt, and subject to redemption by Buckelew in case Buckelew saw fit to redeem; but if he elected not to redeem, then that Ross should be forced to hold the property as his own at the price paid for it? Was it understood between them that if Ross

should purchase at the foreclosure sale, Buckelew was to have the right to claim the benefit of the purchase, if it turned out to be an advantageous one, or to reject it if he elected to do so? There is nothing in the contract to justify the belief that the parties contemplated anything of the kind. On the contrary, it is evident that Ross and Phelan, in their capacity of creditors, retained the right to do whatever was necessary and proper to procure satisfaction of the debt due to them from Buckelew; and, as a means to that end, it was obviously within the contemplation of the parties that they should have the right to foreclose the Turner mortgage; and if they should elect to do so, to purchase for their own account the mortgaged property, holding the surplus, if any, in trust for Buckelew. This, in our opinion, was the only trust created by the instrument, except in so far as they were bound to the use of due diligence for the collection of the Turner note and mortgage. It has not been claimed, and could not be maintained, that under the contract it was imperative on Ross to purchase at the foreclosure sale, whether he deemed it to his advantage to do so or not. If he had failed to purchase at any price, Buckelew could not have complained in the absence of fraud.

On the other hand, having elected to purchase at that sale, as a legitimate method of procuring payment *pro tanto*, of the debt due to him from Buckelew, he is entitled to the exclusive benefit of the purchase, unless by the terms of the contract a trust is created, which denies to Ross the usual right of a creditor to purchase the property of his debtor at a fair judicial sale. We think the contract not only fails to create such a trust, but, on the contrary, tends strongly to the conclusion that Ross was not thereby intended to be deprived of any of his rights as a creditor, including the right to purchase for his exclusive benefit the mortgaged property at the foreclosure sale.

The view we have taken of the case renders it unnecessary to consider the other questions presented in the record.

Judgment affirmed.

Mr. Justice RHODES delivered the following dissenting opinion, in which Mr. Justice SANDERSON concurred:

The rehearing has confirmed us in our former opinion, and we therefore dissent from the reasoning and judgment of our associates.